UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALBERT ROSSINI | No. 17 CR 522<br><br>Judge John J. Tharp, Jr. |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully recommends that the Court accept the findings and calculations in the Presentence Investigation Report (PSR) and sentence defendant Albert Rossini to a term of 51 months' imprisonment. Such a sentence would account for the nature of defendant's fraud while on pre-trial release for another fraud, his prolific criminal history, and the need to promote respect for the law. While defendant's conduct and characteristics could justify an upward variance, the Government recommends a sentence at the high-end of the Guidelines as sufficient to achieve the goals of sentencing. To achieve those goals, any sentence in this case must run consecutively to defendant's sentence for his separate 2018 fraud conviction.

I.  **STATEMENT OF FACTS**

The PSR, including the Government's Version of the Offense, accurately summarizes the facts and circumstances material to the defendant's offense of conviction. R. 180.

**A. References to Government's Version and Bond Conditions in 15 CR 515**

There are a few instances where the PSR refers to facts as being contained in the Government's Version of the Offense for this case, when those facts were actually included in the Government's Version for defendant's 2018 fraud conviction, 15 CR 515. In paragraph 47, the PSR discusses defendant's laundering of drug money through currency exchanges in order to pay the bond of a state criminal defendant. *Id*. The PSR, in describing that conduct, references "the Government's Version of the Offense prepared for this case," meaning the current one; that phrase should read "the Government's Version of the Offense prepared for defendant's 2018 fraud conviction," or similar. *Id*. That paragraph goes on to describe defendant's alleged theft of the drug money and bank fraud in the same case, again referencing "the Government's Version of the Offense prepared in this case," when it should reference "the Government's Version of the Offense prepared in 15 CR 515." *Id*.

Similarly, paragraph 85 the PSR refers to defendant's "bond conditions in the instant matter." *Id*. The Government believes this should be a reference to defendant's bond conditions in 15 CR 515.

2

### B. Defendant's Scheme

Defendant was on pretrial release in 15 CR 515 from August 25, 2015, until his arrest in this case on July 28, 2017. R. 5. That prior case was in connection to a multi-million dollar Ponzi scheme that defendant was convicted for on June 13, 2018. 15 CR 515, R. 346. In the months preceding his arrest, defendant was out on release, and his Ponzi scheme had come crashing down. He needed money, and he devised the fraud scheme he was convicted of in this case to get it.

The core of defendant's scheme was using bad checks to placate people he owed money to, to scam quick cash from unsuspecting banks, and to do both of those things at once. The checks that defendant used were each one or more of the following: from a closed account, stolen and forged, or not connected to any bank account.

On March 7, 2017, defendant gave a check to the landlord of defendant's office building for unpaid rent. The check was from a closed account at A.F.T. JPS Imports and Exports International ("A.F.T. JPS"), and bounced. Defendant then deposited another A.F.T. JPS check dated April 6, 2017, into defendant's own bank account to inflate the account balance and enable defendant to withdraw cash.

Defendant then wrote and gave a check dated May 23, 2017, to a friend, M.B., to repay a loan. That check was not from a bank at all, but had been created by Rossini using account information that was not connected to any account, but purported to be from a Go Bank account.

On May 25, 2017, defendant engaged in a flurry of activity to convince another friend to which he owed money, G.S., that defendant had repaid the friend with a cashier's check. Instead of a cashier's check, defendant deposited a number of bad checks into G.S.'s account. On May 25, 2017, he deposited an A.F.T. JPS check into G.S.'s account, and also deposited a check that defendant had stolen from his attorney and forged. Both of those checks were from closed accounts, but succeeded in temporarily inflating the balance in G.S.'s account. Defendant had told G.S. that the cashier's check defendant had deposited was for more money than defendant owed G.S., and so on May 26, 2017, G.S. withdrew cash from G.S.'s account and gave it to defendant. Defendant deposited a third check into G.S.'s account later on the 26th in an attempt to buoy the account balance further and delay G.S. or the bank noticing defendant's fraud. That third check was a fake Go Bank check like the one that defendant had given to M.B.

Defendant had stolen another check from his lawyer, and on June 10, 2017, defendant succeeded in cashing that check, which was associated with an active account.

After G.S.'s bank and G.S. discovered the fraud, G.S. began contacting defendant for repayment. As part of defendant's attempts to get G.S. off of his back, defendant mailed another A.F.T. JPS check (this one with the company's DBA name on it), dated July 12, 2017, to defendant's office.

4

Finally, defendant deposited an A.F.T. JPS check into his own bank account on July 18, 2017, again to inflate the account balance and allow him to withdraw cash.

The Go Bank check to M.B., the A.F.T. JPS check to G.S., the Go Bank check to G.S., and the A.F.T. JPS check deposited in defendant's own account on July 18, 2017, represented the counts on which defendant was convicted. The jury heard testimony and saw exhibits of the other checks used in the scheme before rendering their verdict on the scheme as a whole. Defendant's bad-check spree lasted over five months, and the bad checks he wrote totaled $61,564. R. 180 at ¶19.

Defendant defrauded three different banks, and used the name of a fourth on the fraudulent checks he created. In the process of swindling the banks, he swindled individuals as well. He led his office landlord to believe that defendant was finally paying the rent he owed, when really defendant had handed over a worthless piece of paper. M.B. thought that defendant was repaying his loan; that was not the case. And G.S. in particular was put through the ringer. G.S. went from thinking he was being repaid, to realizing not only had defendant not repaid his debt, he had stolen money from G.S.'s bank that G.S. worried he could be liable for. Defendant said that he would make it right with G.S.'s bank, but took no steps to do so, only continuing to string G.S. along with promises of repayment.

Defendant's attempts to conceal his scheme went beyond his continued use of bad checks, piling one on top of the other, and extended even to his defense in the current case. Defendant submitted an affidavit in support of a pro se motion to

5

dismiss that included a number of falsehoods, most notably that defendant thought that the A.F.T. JPS checks that he used were "good checks." *See* R. 121; R. 180, ¶ 31.

## II. CALCULATION OF GUIDELINES SENTENCE

The PSR accurately calculates defendants' offense level and criminal history category at 18 and IV. His Guidelines imprisonment range is 41 to 51 months.

Defendant's base offense level is 7 under U.S.S.G §2B1.1, because defendant was convicted of four counts of violating 18 U.S.C. § 1344, which carries a maximum term of imprisonment of 20 years. R. 180, ¶ 27.

Defendant receives a 6-point upward adjustment under U.S.S.G. §2B1.1(b)(1)(D), because his intended loss amount is between $40,000 and $95,000. *Id*. at ¶ 28. Specifically, defendant's intended loss amount is $61,564. *Id*. As described above, the jury heard evidence regarding all of the checks that contributed to the calculation of the intended loss amount. All of those checks were part of the scheme to defraud, and they were written and used within the time of the scheme as alleged in the indictment, that is, from November 2016 through July 2017.

Defendant also receives a two-point upward adjustment for obstruction of justice under U.S.S.G. §3C1.1. *Id*. at ¶ 31. As described above, defendant submitted an affidavit in support of a pro se motion to dismiss that contained material falsehoods. Defendant claimed that he thought checks from A.F.T. JPS were "good checks," despite evidence at trial to the contrary. Defendant had used

6

A.F.T. JPS checks, and had received bank statements showing that the account was closed. R. 171, 180-82. Defendant's own account had been closed after it was overdrafted following the use of a bad A.F.T. JPS check. *Id.* Defendant's false affidavit could have obstructed the administration of justice had his motion to dismiss been successful, and the obstructive conduct related directly to the offense of conviction.

Finally, defendant receives a 3-point upward adjustment under U.S.S.G. §3C1.3, because 18 U.S.C. § 3147 applies. This Court found that § 3147 applied following defendant's conviction at trial on the bank fraud counts. R. 165. As discussed above, defendant was on pretrial release in the Ponzi-scheme case when he engaged in the offense conduct in this case. The Guidelines note that § 3147 requires an additional prison term to run consecutively to any other term of imprisonment. U.S.S.G. §3C1.3, App. N. 1. The Guidelines' proposed approach to the application of §3C1.3 is to attribute some portion of the sentence to § 3147 and some to the substantive counts. *Id.* For instance, in the present case, the Court could sentence defendant to 45 months' imprisonment on the bank fraud counts, and 6 consecutive months based on the § 3147 enhancement, for a total sentence of 51 months.

Defendant does not receive a downward adjustment for acceptance of responsibility, as he did the opposite. Defendant vigorously denied responsibility, going so far as to author a false affidavit and earn himself the obstruction enhancement.

7

### III.   FACTORS UNDER 18 U.S.C. § 3553(a)

The factors articulated in 18 U.S.C. 3553(a) weigh in favor of a sentence at the high end of the Guidelines range.

**A. Nature and Circumstances of the Offense**

Defendant had the extraordinary good fortune to be on pretrial release despite allegations that he ran a multi-million dollar Ponzi scheme targeting a vulnerable immigrant religious community.  Instead of keeping his head down and awaiting trial, defendant continued to scam, this time bilking banks out of money and using bad checks to convince people in his life that he owed money to that they had been paid back.  He violated the trust of the Court that released him, and undermined the trust required for our financial system to function.  He was creative in his methods, stealing and forging checks, using checks to closed accounts, and creating his own checks unconnected to any real bank account.  Defendant's conduct involved the manipulation of those around him, and the manipulation of the banking system.  The nature and circumstances of defendant's conduct warrant a sentence at the high end of the Guidelines range.

**B. History and Characteristics**

Defendant's history and characteristics are the most consequential factor putting upward pressure on his sentence.  Defendant's criminal career includes a dizzying quantity of criminality.  His first conviction, for forgery in Kansas in 1986, is remarkably similar to his conduct in the current case, occurring over a decade and a half later.  R. 180 at ¶ 44.  In that case, which defendant does not receive

8

criminal history points for, he forged and cashed a check, then provided the victim with another bad check when confronted about the forgery. *Id*. Defendant went on to tally up convictions on 19 counts over five different cases, before getting back to his roots and forging and passing bad checks in the present case. Id. at ¶¶ 44-48.

All of his criminal history is fraud-related, including three federal cases preceding this one. The case that defendant was on pretrial release for when he committed the current offense, the multi-million-dollar Ponzi scheme, was defendant's criminal magnum opus. As described in the PSR, defendant represented to victim investors that they were obtaining interests in real properties when they were really not, the scheme caused over $5 million in investor losses, and defendant enlisted multiple co-conspirators in various roles to give the scheme the appearance of legitimacy. *Id*. at ¶ 48.

Defendant's history is characterized not just by his repeated appearance in federal court, but by a callous disregard for his victims. His second federal conviction, for two counts of mail fraud, involved the sale of stock from an estate without authorization and for his personal benefit. In a preview of his future Ponzi-scheming, "defendant concealed the unauthorized sale of stock by submitting purported dividend payments to the victim." *Id*. at ¶46. When confronted by the victim, defendant continued to lie, saying the stock certificates had been lost and making false promises of repayment. Defendant went so far as to file an affidavit in a civil case on the matter that falsely accused the victim of being aware of the stock sale, receiving the proceeds, and keeping them secret from her husband to conceal

9

an affair. Defendant's patterns are by now well-developed: lie, continue to lie even when caught, and attempt to obstruct.

Defendant's characteristic dishonesty was on display even in his sentencing in the Ponzi-scheme case, in which he testified. The Court in that case had this to say regarding defendant's obstruction:

> [T]he Court finds Mr. Rossini's factual account, as stated in his sentencing filings, as well as today, to be wholly incredible. I do not think -- I find that his testimony and his account of the facts are not credible in light of the record that was presented to the jury during the jury trial in this case that I oversaw. Furthermore, additional reasons that I give no weight to Mr. Rossini's testimony include, as I noted before, his prior history of fraud convictions, the fact that he's already lied to this Court in the past while he was on pretrial release, and his incentives for doing so now. Mr. Rossini's theory of the case or his rendition of what happened is also, as Mr. Mitchell pointed out, directly contrary to the findings of the jury and the verdict that found Mr. Rossini guilty on all 14 counts of wire and mail fraud. For those reasons, the Court does not give any weight to Mr. Rossini's testimony here or his account of the events, and the Court finds that a two-level enhancement under Section 3C1.1 is warranted in this case.

15 CR 515, R. 776, 57.

Perhaps unsurprisingly, despite the significant proceeds of his later frauds, defendant has not paid off his restitution on his earlier frauds, with $226,380.02 still owed in restitution from his first federal case. R. 180 at ¶ 45.

Defendant's inability to follow rules has extended to his time in custody, where he has lost good time and privileges because of abuse of the telephone system and possessing an unauthorized item. *Id.* at ¶¶ 10, 45.

Defendant claims that his health issues and his age of 76 justify his release. Defendant has not provided medical documentation, and the Bureau of Prisons has proven it is equipped to provide defendant with any care he needs during his time

10

in custody.  Given defendant's consistent fraudulent conduct well into his senior years, his age cannot give this Court any confidence that defendant will not reoffend absent a significant additional prison term.

Defendant's employment history likewise provides no comfort.  Defendant's representations about his employment at Black Duck Restaurant simply cannot be trusted.  As noted in paragraph 83 of the PSR, that restaurant was not open for the majority of the time defendant claimed to have worked there.  Defendant's "employment" with A.F.T. JPS is directly related to the offense conduct in this case, as defendant used bad checks from the company to perpetuate his bank fraud.  As for his period of "self-employment," defendant has provided no reason to believe he was doing legitimate business through his various involuntarily dissolved entities. *Id*. at ¶ 85.  And at least one of those, Devon Street Investments, was the entity used to execute defendant's Ponzi scheme.

Usually defendants' misdeeds are mixed in with sympathetic characteristics. Defendants are remorseful.  Or they are scarred by a difficult upbringing.  Not so for defendant.  Defendant's conduct and his history betray a penchant for lying and stealing at every opportunity.  Defendant has evinced no regard for human suffering, and no regard for the law.

### C. Promoting Respect for the Law, Deterrence, and Protecting the Public

Promoting respect for the law is a critical consideration in a case like this one. Defendant has time and again shown a blatant disregard for the law, and has been undeterred by prior federal fraud sentences.  The prospect of his third federal

11

fraud conviction was not enough to convince him not to earn his fourth while on pretrial release in the Ponzi-scheme case. Promoting respect for the bank fraud law in particular is also critical. Too often the consequences of actions like defendant's are not appreciated. Defendant did not just dupe banks into giving him free money, he undermined the financial system that enables broad-based prosperity. Banks, businesses, and individuals need to be able to trust representations in order to conduct business, and defendant abused that trust for his own personal gain. A sentence at the high end of the Guidelines range sends a strong message that conduct like defendant's will not be tolerated by the federal courts. A just sentence in this case must also be served consecutively to defendant's sentence in the Ponzi-scheme case; a concurrent sentence would not adequately account for the seriousness of the present offense, and would undermine respect for the law.

  A significant sentence in this case is necessary to have any hope of specific deterrence of this defendant, although this is the rare white-collar case where protection of the public may loom larger than specific deterrence. Defendant's lack of remorse, his commission of the present offense while on release, and his consistent pattern of fraudulent activity make recidivism a very real possibility. Defendant's suggestion that he might be able to strike some deals on affordable housing built on vacant lots after he gets out, *Id*. at ¶ 81, sounds more like the musings of a con-man contemplating his next mark than a man who understands his situation and has been chastened by his time in custody.

General deterrence is very much achievable, though. Many would-be criminals that would contemplate the type of conduct defendant engaged in are not serial fraudsters. A sentence of 51 months would make clear that there are serious repercussions for committing bank fraud, and could deter individuals less committed to committing financial crimes than defendant.

## IV. CONCLUSION

Based on his criminal history, the Guidelines recommend a term of imprisonment in the range of 41 to 51 months. The 18 U.S.C. § 3553(a) factors place upward pressure on the sentence and justify a sentence at the high end of the Guidelines range.

For the reasons stated above and in the PSR and the Government's Version of the Offense, the United States respectfully recommends that the Court accept the facts and calculations of the PSR and sentence defendant to a term of imprisonment of 51 months, to be served consecutively to his sentence in 15 CR 515.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: */s/Paul Schied*
PAUL SCHIED
Assistant United States Attorney
219 South Dearborn, Room 500
Chicago, Illinois 60604
(312) 697-4091

Dated: December 2, 2024