UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,**  Plaintiff,  v.  **Albert Rossini**,  Defendant. | No. 17 CR 522  Judge John J. Tharp, Jr. |

## Defense Sentencing Memorandum

Defendant Albert Rossini, through undersigned counsel, respectfully submits this sentencing memorandum. The defense recommends that the Court impose a sentence of 18 months' home incarceration, to run consecutive to his sentence in 15 CR 515-1.

### 1. Sentences of similarly situated defendants

The probation officer recommended a sentence of 51 months, based on the disputed loss amount guideline enhancement. A sentence of this length would put Mr. Rossini's sentence at more than double the median sentences for similarly situated defendants nationwide and within the Seventh Circuit, and 50% higher than the median sentence within the Northern District of Illinois.

### 1.1. United States Sentencing Commission statistics

According to statistics kept by the United States Sentencing Commission (USSC), nationwide, there were 947 fraud cases in the past five years with a defendant who was sentenced under primary guideline §2B1.1 and who was in criminal history category IV. The median sentence for those similarly situated

- 2 -

defendants was 24 months [*See* Fig. 1], and nearly half of those similarly situated defendants received sentences shorter than two years.



*Figure 2*



*Figure 1*



*Figure 4*



*Figure 3*

Within the Seventh Circuit, there were 45 similarly situated defendants in the past five years, with a median sentence of 21 months, and over half of those defendants received a sentence shorter than two years. *See* Figure 3.

The median sentence of 33 months in Northern District of Illinois is outlier at nine months longer than the national median and a year longer than the median in the Seventh Circuit, however, the group of similarly situated defendants is very small. There were only 17 similarly situated defendants in the past five years, and nearly half of those defendants received a sentence shorter than two years. *See* Figure 4.

### 1.2. Statistics kept by the U.S. Sentencing Commission represent similarly situated defendants

In prior cases, the government has taken issue with the defense's use of U.S. Sentencing Commission statistics to identify sentences imposed on similarly situated defendants, calling them so broad, and general, as to be practically useless for purposes of comparison.

The U.S. Sentencing Commission disagrees. In its Introduction to the 2024 *Sourcebook of Federal Sentencing Statistics*, the Commission explains:

> The Commission collects and analyzes data on federal sentences to support its various activities. As authorized by Congress, the Commission's numerous research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices; (2) the publication of data concerning the sentencing process; (3) t*he systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a)* of title 18, United States Code; and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.

(Emphasis added.) The Commission makes this data publicly available through its Interactive Data Analyzer, and it also issues a variety of research reports assessing sentencing data.

The annual sourcebook contains a wealth of sentencing information, but for present purposes the key report is *Inter-District Differences in Federal Sentencing Practices* (Jan. 2020). The introduction explains:

> This report, the third in the series, builds directly upon the Commission's Intra-City Report. As noted in that publication, *the Commission's ongoing analysis in this area directly relates to a key goal of the Sentencing Reform Act of 1984: reducing unwarranted sentencing disparities* that existed in the federal judicial system. In particular, the Act was the result of a widespread bipartisan concern that such disparities existed both regionally (e.g., differences among the districts) and within the same courthouse.

*Id.*, at 6. In the methodology section, the Commission notes that it uses the guideline minimum as the benchmark for its comparative analysis:

> For each case, the guideline minimum and the actual sentence imposed were determined, and a percent difference between the two was calculated….
>
> The guideline minimum was chosen as the baseline for analysis because of the gravitational pull it tends to have on sentences. The Supreme Court has directed "benchmark" and "starting point" in the post-Booker federal sentencing process and to "remain cognizant" of it during all three steps of the "Booker three-step process" used at federal sentencing.

*Id.*, at 18. To state the obvious, the guideline minimum is necessarily determined by a defendant's Final Offense Level and Criminal History Category. The Commission used this benchmark to compare sentencing outcomes by primary guideline. *See id.*, at 16 (Analysis By Primary Guideline):

> In creating the datasets, the Commission identified 972,783 cases across the nation during fiscal years 2005 to 2017. The Commission then isolated the relevant cases for each guideline-specific analysis by limiting cases based on their primary guideline—that is, the guideline with the highest adjusted offense level, which therefore controlled the guideline calculation. *For example, the §2B1.1 analysis includes only those cases in which §2B1.1 was the primary guideline*.

*Id.*, at 16–17 (emphasis added).

In short, the Commission examines sentencing disparities by comparing sentencing outcomes based on (1) the primary guideline, (2) the final offense level,

(3) the criminal history category, and (4) the sentence imposed. That is precisely the data the defense has presented.

To be fair, it can be useful and interesting to delve further into case statistics to compare them in greater detail. The Commission's dataset includes a daunting array of variables that can be examined, including Specific Offense Characteristics, Base Offense Levels, and so on. *See* Variable Codebook for Individual Datafile, FY 1999–2023. But two practical barriers counsel against using more granular statistics at an individual sentencing hearing. First, the datafiles are formatted for SAS and SPSS, which to even open require advanced data analysis software that is expensive and difficult for non-specialists to learn and use effectively. The Interactive Data Analyzer was created specifically to address that problem. Second, the Commission cautions against using too many variable filters:

> Using several filters at one time can result in a small number of cases in any particular table or figure. For example, when using numerous filters, it may be possible that some figures will display percentages or averages of a very small number of cases. The Commission cautions that analyses based on small populations may have limited informational value in discerning trends, generalizing to larger populations, or making other statistical observations.

Interactive Data Analyzer, Ask IDA (click question mark for pop up). For the purpose of comparing the sentences of similarly situated defendants at an individual sentencing hearing, the broader dataset sorted by primary guideline and criminal history category is the most appropriate and is used by the Commission itself.[1]

As a final point, it is worth asking: if this methodology is not appropriate for comparing similarly situated codefendants, as section 3553(a) requires, then what methodology is? The government has not provided an answer in any case where

---

[1] It would be more helpful if the IDA also allowed filtration by final offense level, but that is not yet available. The best option currently available is the data presented by the defense.

- 7 -

they have previously raised this objection, nor has it presented any affirmative argument whatsoever regarding similarly situated co-defendants.

Based on this data, a sentence of 51 months as the Probation Office recommends (Sentencing Recommendation, at 1) is out of step with sentences for similarly situated defendants, and greater than necessary. When these statistics are considered in conjunction with the mitigating factors discussed in the history and characteristics section, it is sufficient, but not greater than necessary, for the court to give Mr. Rossini a below-guidelines sentence of 18 months' home incarceration.

2. **Mr. Rossini's history and characteristics**

Mr. Rossini will turn 77 years old in September. While it is more commonly discussed with youthful clients, the policy statement contained in § 5H1.1 of the 2024 Guidelines Manual also directs courts to consider the age of the defendant in the context of elderly defendants, stating:

> Age may be relevant in determining whether a departure is warranted. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as, and less costly than, incarceration.

Mr. Rossini's health is failing. As the court is aware, he is reliant on a pacemaker to keep his heart beating and is in the process of scheduling its surgical replacement as the device nears the end of its lifespan. USSG § 5H1.4 directs courts to contemplate a downward departure[2] for defendants in poor health and consider less costly alternatives to incarceration, such as home detention, in the case of a seriously infirm defendant.

---

[2] Counsel notes that formal departures from the guidelines have less weight in a post-*Booker* case where the guidelines are advisory, but the policy statements in Chapter 5 may still be considered under § 3553(a) factors.

If the court gives Mr. Rossini a 51-month sentence, he will be 82 when he's released. There is a real chance that he will not live that long. As the court is aware, one of Mr. Rossini's co-defendants in the 2015 case died of cancer while serving his sentence in Bureau of Prisons custody. A 51-month custodial sentence may under the circumstances be a de facto life sentence.

3.  **Deterrence does not require a lengthy sentence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)."

More recently, the University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review* (Sep. 22, 2021). In their abstract, the study's authors summarized their findings:

> Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies, the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." **Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism**.

Given the empirical evidence regarding the limited deterrent effect of custodial sentences and Mr. Rossini's health, a sentence of 18 months home incarceration is adequate but not greater than necessary to deter Mr. Rossini. There is no additional deterrent effect, either general or specific, for a longer custodial sentence.

4. **A fine is not appropriate**

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a).

Mr. Rossini has no present income and thus has no ability to pay a fine. The Court appointed counsel to represent Mr. Rossini under the CJA due to his lack of financial resources. Moreover, Mr. Rossini's income once released is uncertain, and it is unlikely that he will be able to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

5. **Objections to discretionary conditions of supervised release**

*Partial objection to Discretionary Condition 16*: Mr. Rossini objects to the requirement that Probation be allowed to visit him at work.

As an initial matter, given Mr. Rossini's age and health, he may not be able to work after his release from incarceration. Much of his capacity to work will be determined by how long his sentence is—if Mr. Rossini is released while he's still in his 70s, his capacity to work will be better than if he's released after he's moved into his 80s.

If Mr. Rossini is able to work, probation can adequately supervise him with home visits, visits to community service locations, or visits at other reasonable locations specified by the supervising officer, including meeting with Mr. Rossini

near his workplace during his breaks, such as a nearby coffee shop or restaurant, or in the parking lot of his workplace.

Should the court decide to impose this condition over the objection, counsel proposes modifying the language of the condition as follows "probation may visit Mr. Rossini at work, if the visit is pre-arranged with Mr. Rossini." This modification gives probation the flexibility to meet with Mr. Rossini at work, while protecting his employment by ensuring that probation visits are not disruptive. Judge Rowland proposed and gave this language in two recent cases, *USA v. Lee* (22 CR 535) and *USA v. Whitehead* (22 CR 393-2).

        Respectfully Submitted,

        /s/ Holly N. Blaine
        Attorney for Albert Rossini

        James G. Vanzant
        Holly N. Blaine
        BLAINE & VANZANT, LLP
        922 Davis Street
        Evanston, Illinois 60201
        (312) 788-7584
        jgv@blainevanzant.com
        hnb@blainevanzant.com

- 10 -
DEFENSE SENTENCING MEMORANDUM